IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ARNOLD J. HARRIS, : | |
| Plaintiff : | |
| : | No. 1:16-CV-0040 |
| v. : | |
| : | (Judge Kane) |
| HEARING EXAMINER : | |
| A. HIMES, et al., : | |
| Defendants : | |

## MEMORANDUM

The instant civil rights action was filed by pro se Plaintiff, Arnold J. Harris, confined at the State Correctional Institution, Huntingdon, Pennsylvania ("SCI-Huntingdon"), pursuant to 42 U.S.C § 1983. In his complaint, Plaintiff alleges that Correctional Officer Frye retaliated against him by filing a false misconduct report for a conversation Plaintiff had with Ms. Snyder, the law librarian, that was protected under Plaintiff's First Amendment right to free speech. (Doc. No. 1.) Plaintiff also alleges that Hearing Examiner Himes violated his procedural due process rights by failing to call Plaintiff's witness, Ms. Snyder, during his disciplinary hearing. (Id.) Currently pending before the Court is Defendants' motion for summary judgment. (Doc. No. 28). The motion has been fully briefed and is ripe for disposition. For the reasons set forth below, Defendants' motion will be granted.

I.      **Background**

    A.      **Allegations of the Complaint**

Plaintiff claims that on August 19, 2015, while he was working at a computer in the law library, Ms. Snyder approached him asking if his work was legal in nature. (Doc. No. 1 ¶¶ 6, 7.) Plaintiff explained to her that it was and showed her his work, after which she allowed him to continue. (Id. ¶ 8.) When Plaintiff completed his work for that morning, he started back to his

1

block when Defendant Frye stopped him, showing him a hangman's noose and stating that he could make Plaintiff "disappear." (Id. ¶¶9-11.) The following day, Plaintiff returned to the law library to complete his work from the previous day. (Id. ¶ 13.) There were no computers immediately available but at about 9:00 am, Ms. Snyder called Plaintiff to her desk to inform him that a computer was available and that she "hope[d] his work was legal." (Id. ¶ 14.) Plaintiff brought his work to Ms. Snyder to prove that his work was of legal nature at which time she assigned him to computer number four. (Id. ¶ 15.)

While Plaintiff was approaching computer number four, Defendant Frye ordered him back to his block for an alleged argument he had with Ms. Snyder. (Id. ¶ 16.) Plaintiff stated to Defendant Frye that he had not been arguing with her and that he did nothing wrong, to which Defendant Frye said, among other things, "keep talking black boy" and "I'm going to make you disappear." (Id. ¶¶ 17-21.) Plaintiff retrieved his pass and returned to his block where he then asked a staff officer for a grievance form. (Id. ¶ 22.)

While he was filling out his grievance form, several officers came to Plaintiff's block to escort him to a restricted housing unit ("RHU"). (Id. ¶¶ 23, 24.) Within four hours of arriving at the RHU, Plaintiff received a misconduct filed by Defendant Frye asserting four class one charges. (Id. ¶ 24.) On August 25, 2015, Plaintiff had his hearing before Hearing Examiner Himes. (Id. ¶ 26.) Despite Plaintiff's request to call Ms. Snyder as a witness, Defendant Himes denied this request, stating that Ms. Snyder "is not necessary." (Id. ¶ 27.) Two of the four charges were dismissed and Plaintiff was given thirty (30) days in the RHU. (Id. ¶ 28.)

Plaintiff appealed Defendant Himes' decision which was ultimately remanded back to Defendant Himes for a rehearing. (Id. at Ex. K.) On October 27, 2015, Defendant Himes dismissed the entire misconduct without prejudice. (Id. ¶ 38.) Plaintiff also alleges that on

September 16, 2015, he called the inmate abuse hotline to report the threats of Defendant Frye to the office of special investigations and intelligence and also mailed a complaint to that office. (Id. ¶¶ 32, 35.)

Plaintiff avers that he was discharged from a treatment program on September 3, 2015 for absenteeism as a result of being placed in RHU. (Id. ¶ 42.) Because he failed to complete the treatment program, his parole was denied until he satisfactorily completes the 78 week treatment program. (Id. ¶¶ 42, 43.)

### B. Statement of Undisputed Facts[1]

Plaintiff, an inmate currently incarcerated at SCI-Huntingdon, signed into the library on August 19, 2015 at approximately 8:40 a.m. and went to the back of the library. (Doc. No. 30 ¶¶ 4, 5, Ex. 3, Attach. B.)[2] Around 9:51 a.m., the law librarian, Ms. Snyder, walked toward the back of the library and returned to her desk at about 9:53 a.m. (Id. ¶ 6.) Plaintiff then sat at a table in the library and around 10:17 a.m., he approached Ms. Snyder and then signed out. (Id. ¶¶ 7-9.) As Plaintiff was leaving, Defendant Frye said to him, "I'm going to make you disappear, black boy." (Id. ¶ 32.) This was the first time that Plaintiff had contact with

---

[1] Middle District of Pennsylvania Local Rules of Court provide that in addition to filing a brief in response to the moving party's brief in support, "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of material facts responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party] ..., as to which it is contended that there exists a genuine issue to be tried." See M.D. Pa. LR 56. 1. The rule further states that the statement of material facts required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party. See id. Unless otherwise noted, the factual background herein derives from Defendants' Rule 56.1 statement of material facts. (See Doc. No. 30.) Plaintiff did not file a response to Defendants' statement of material facts. The Court accordingly deems the facts set forth by Defendants to be undisputed. See Local Rule 56.1; Fed. R. Civ. P. 56(e)(2).

[2] Exhibit 3, Attachment B to Plaintiff's statement of material facts is video footage within the law library from August 19 and 20, 2015.

3

Defendant Frye. (Id. ¶ 31.) Plaintiff "ignored the insults … took [his] pass and [he] left." (Id. ¶ 33.)

The following day, Plaintiff signed into the library around 8:25 a.m. (Id. ¶ 10.) At 9:07 a.m., Ms. Snyder waved her finger toward Plaintiff motioning him to come to her desk. (Id. ¶ 11.) After a brief conversation, Plaintiff returned to his table and picked up a couple of papers and returned to Ms. Snyder's desk and showed her the papers. (Id. ¶¶ 12-14.) Plaintiff again returned to his table and picked up more papers and returned to Ms. Snyder's desk and began showing her the additional papers. (Id. ¶¶ 15, 16.) At about 9:09 a.m., Plaintiff is seen making hand gestures and becoming more animated towards Ms. Snyder. (Id. ¶ 17.) Inmates in the area can be seen looking at Plaintiff and Ms. Snyder. (Id. ¶ 18.) Plaintiff provided that Ms. Snyder paged through his documents to confirm they were legal in nature and told him he could go to word processor four. (Id. ¶ 36.) Ms. Snyder also told Plaintiff that she was going to come over to the computer and check on Plaintiff and as Plaintiff was walking away from her, shaking his head and shrugging his shoulders, he turned around and said, "that is your prerogative" and kept walking. (Id. ¶¶ 37, 38.)

At 9:10 a.m., Defendant Frye walked into the library and appeared to speak to Ms. Snyder. (Id. ¶ 21.) At about the same time, Plaintiff began walking toward the right side of the library towards word processor number four when Defendant Frye motioned with his hand and told Plaintiff to return to his block. (Id. ¶¶ 22, 39.) Plaintiff questioned Defendant Frye as to what he did, to which Defendant Frye responded "I'm ordering you to go back to your block." (Id. ¶¶ 39-40.) While Plaintiff was looking for his pass, he said to Defendant Frye, "I have a right to the library. Why are you forcing me to go back to my block?" (Id. ¶ 43.) Plaintiff

4

provides that Defendant Frye then responded, "keep talking, nigger." (Id. ¶ 44.) Plaintiff then returned to his cell block. (Id. ¶ 46.)

On that same day, August 20, 2015, Plaintiff was issued Misconduct #B589252 for: (1) threatening an employee; (2) sexual harassment; (3) using abusive, obscene language to an employee; and (4) refusing to obey an order. (Id. ¶¶ 47, 48.) Defendant Frye's misconduct report provides that Plaintiff threatened him and alleged that he was "fucking Ms. Snyder." (Id. ¶ 49.) On August 25, 2015, Plaintiff had his hearing before Defendant Himes wherein Plaintiff requested that Ms. Snyder be a witness. (Id. ¶¶ 52, 53.) In Plaintiff's written version of events, there was no mention of any racial allegations against Defendant Frye. (Id. ¶ 54.) At the hearing, Defendant Himes threw out the charges of threatening an employee and sexual harassment but kept the charges of obscene abusive language and refusing to obey an order. (Id. ¶ 55.) Plaintiff asked Defendant Himes where his witness was, to which Defendant Himes stated that Ms. Snyder was not necessary to determine Plaintiff's guilt or innocence. (Id. ¶¶ 56, 57.) Plaintiff was given thirty days in the Diversionary Treatment Unit ("DTU"), for which he only served twenty. (Id. ¶¶ 58, 65.)

Plaintiff appealed this decision all the way to final review. (Id. ¶¶ 59-63.) Plaintiff raised, for the first time, racial allegations against Defendant Frye on his appeal to the facility manager. (Id. ¶¶ 59, 61.) On final review, the misconduct was remanded for a rehearing before Defendant Himes so that Ms. Snyder's testimony could be obtained and considered. (Id. ¶¶ 63, 64.) On October 22, 2015, a rehearing was conducted but it was continued because Defendant Himes felt that Plaintiff was "highly argumentative during this hearing and makes some very serious racial allegations in his written version." (Id. ¶ 66.) The hearing was resumed on

October 27, 2015, wherein Defendant Himes dismissed the charges against Plaintiff without prejudice. (Id. ¶¶ 67, 70.)

Plaintiff also called the Inmate Abuse Hotline on September 16, 2015, alleging that Defendant Frye: (1) called him "black boy"; (2) called him a "nigger"; (3) threatened him by saying that he was going to lynch him and make him go away; (4) showed him a hangman's noose made out of rubber bands; and (5) issued him a false misconduct. (Id. ¶ 74.) Plaintiff, Defendant Frye, and Ms. Snyder were all interviewed as part of the investigation and the video was also reviewed. (Id. ¶¶ 75, 76.) The investigation's conclusion was that Plaintiff's allegations were unsubstantiated and inconsistent with the video evidence. (Id. ¶ 77.)

## II. Legal Standard – Motion for Summary Judgment

Federal Rule of Civil Procedure 56(a) requires the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Anderson, 477 U.S. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 257; Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consolidated Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Electric Co., 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56 to go beyond his pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986). When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323. See Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. White v. Westinghouse Electric Company, 862 F.2d 56, 59 (3d Cir. 1988). In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. Id. (citations omitted). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding

7

to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts et forth in the statement required to be served by the moving party will be deemed to be admitted." L.R. 56.1. A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a pro se litigant. These rules apply with equal force to all parties. See Sanders v. Beard, No. 09-CV-1384, 2010 U.S. Dist. LEXIS, *15 (M.D. Pa. July 20, 2010) (pro se parties "are not excused from complying with court orders and the local rules of court"); Thomas v. Norris, No. 02-CV-01854, 2006 U.S. Dist. LEXIS 64347, *11 (M.D. Pa. Sept. 8, 2006) (pro se parties must follow the Federal Rules of Civil Procedure).

### III. Discussion

Defendants Frye and Himes seek entry of summary judgment in their favor and against Plaintiff as to his claims of retaliation, equal protection under the Fourteenth Amendment, and procedural due process under the Fourteenth Amendment. Defendants also argue that they are entitled to qualified immunity.

#### A. Procedural Due Process

Defendants argue that they are entitled to summary judgment on Harris' claim that his right to due process was violated when Defendant Himes failed to call his witness because the sanctions resulting from this disciplinary hearing did not affect a protected liberty interest. The Court first notes that the filing of a false misconduct report does not violate an inmate's due process rights. As stated in Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986), a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." However, the "Plaintiff, as all other prison inmates, has the right not to be deprived of a protected liberty

8

interest without due process of law." Id. Thus, where a prisoner is provided due process, no constitutional violation results from his being falsely accused of misconduct. Makenson v. Luzerne Cnty. Corr. Facility, Civ. No. 4-13-2204, 2014 WL 4187666, at *4 (Aug. 22, 2014); Brown v. Hannah, 850 F. Supp. 2d 471, 476 (M.D. Pa. 2012).

The Fourteenth Amendment of the United States Constitution provides in pertinent part: "No State shall ... deprive any person of life, liberty, or property, without due process of law...." The Supreme Court has mandated a two-part analysis of a procedural due process claim: first, "whether the asserted individual interests are encompassed within the ... protection of 'life, liberty or property[,]' " and second, "if protected interests are implicated, we then must decide what procedures constitute 'due process of law.' " Ingraham v. Wright, 430 U.S. 651, 672 (1977). If there is no protected liberty or property interest, it is unnecessary to analyze what procedures were followed when an alleged deprivation of an interest occurred.

In Sandin v. Conner, 515 U.S. 472 (1995), the Supreme Court shifted the focus of the liberty interest analysis from one "based on the language of a particular regulation" to "the nature of the deprivation" experienced by the prisoner. Id. at 481. The Court reasoned, inter alia, that "[d]iscipline by prison officials in response to a wide range of misconduct" is expected as part of an inmate's sentence. Id. at 485. Accordingly, the Court, focusing on the nature of the punishment instead of on the words of any regulation, held that the procedural protections in Wolff v. McDonnell, 418 U.S. 539 (1974)[3], were inapplicable because the "discipline in

---

[3] In Wolff, the Supreme Court recognized that "prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." Id. at 556. However, the Court set forth five requirements of due process in a prison disciplinary proceeding: (1) the right to appear before an impartial decision-making body; (2) twenty-four hour advance written notice of the charges; (3) an opportunity to call witnesses and present documentary evidence, provided the presentation of such does not threaten institutional safety or correctional goals; (4) assistance from an inmate representative …; and (5) a written

9

segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." Sandin, 515 U.S. at 486. For a prisoner, such a deprivation occurs when the prison "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 484.

Courts within this circuit, applying Sandin in various actions, have found no merit in procedural due process claims presented regarding institutional disciplinary hearings which result in disciplinary custody placement. See Torres v. Fauver, 292 F.3d 141, 150–51 (3d Cir. 2002)(because prisoners can reasonably anticipate transfer to disciplinary custody, placement in segregation as a disciplinary sanction did not implicate a protected liberty interest); Griffin v. Vaughn, 112 F.3d 703, 706–08 (3d Cir. 1997) (seven months of disciplinary confinement did not implicate liberty interest); Smith v. Mensinger, 293 F.3d 641, 645, 654 (3d Cir. 2002) (same); Vorhauer v. Conrad, Civ. No. 3-90-2196 (M.D. Pa. Jan. 29, 1997) (Vanaskie, J.) (inmate's confinement in disciplinary custody for ninety days in accordance with DOC procedures did not give rise to a protected liberty interest); Brown v. Stachelek, Civ. No. 95–522, 1995 WL 435316, at *3-4 (E.D. Pa. Jul.20, 1995) (neither the Due Process Clause nor state law supported plaintiff's procedural due process claims because his punishment (at most ninety days in "close custody" and a loss of "minimum status") was not outside the scope of his sentence and did not otherwise violate the Constitution); Marshall v. Shiley, Civ. No. 94-1858, slip op. at 7 (M.D. Pa. July 26, 1996) (McClure, J.) (holding, pursuant to Sandin, that where the plaintiff alleges only that he was sentenced to sixty (60) days in disciplinary segregation, he cannot assert a claim for the violation of his Fourteenth Amendment rights).

---

decision by the fact finders as to the evidence relied upon and the rationale behind their disciplinary action. Id.

Considering the rules of law set forth above, this Court finds that Harris' placement in the diversionary treatment unit for thirty days[4] is not significant enough to constitute an "atypical and significant" hardship triggering due process protection. See Sandin, 515 U.S. at 486; Griffin, 112 F.3d at 706. However, our analysis does not end there. The Court must also consider the actual conditions of Plaintiff's confinement in the DTU in relation to other prison conditions. See Mitchell v. Horn, 318 F.3d 523, 531 (3d Cir. 2003) (citing Shoats, 213 F.3d at 144). Plaintiff alleges that due to his placement in the DTU, he was discharged from a treatment program due to his absenteeism, denied parole, and must now restart the treatment program in order to become eligible for parole.

In considering whether the conditions of Plaintiff's confinement in the DTU (that he alleges contributed to the denial of parole) implicate a liberty interest, it is helpful to consider the decision in Wilkinson v. Austin, 545 U.S. 209 (2005). In Wilkinson, among the conditions that the Court pointed to in concluding that an atypical and significant hardship existed so as to implicate a liberty interest was the fact that an inmate who was otherwise eligible for parole was disqualified from parole consideration as a result of placement into the Ohio supermax facility. Id. at 224. Specifically, upon placement into the supermax facility, inmates received a maximum security classification and that classification prohibited them from being released on parole. Id. As a result, no inmate placed in that facility could be paroled. See Austin v. Wilkinson, 189 F. Supp. 2d 719, 728 (N.D. Oh. 2002).

In contrast, here, Plaintiff has not alleged that his placement into the DTU as a sanction resulted in his disqualification from parole consideration. Rather, he alleges that his inability to finish the required treatment class while he was in DTU led to the denial of parole. Moreover,

---

[4] Plaintiff served only twenty of those thirty days.

the Wilkinson Court did not rely solely on the fact that inmates in that case were disqualified from parole consideration in concluding that an atypical and significant hardship existed; rather, the Court reached its conclusion based on various conditions taken together. See Wilkinson, 545 U.S. at 224. Accordingly, even if Plaintiff alleged that he was disqualified from parole consideration as a result of his placement in the DTU, that circumstance in and of itself would be insufficient for this Court to find that a liberty interest is implicated in Plaintiff's situation. See Rauso v. Vaughn, 79 F. Supp. 2d 550, 551 (E.D. Pa. 2000) (the Constitution does not create an entitlement to parole).[5] Based on the foregoing, Plaintiff's due process claim is meritless because he had no protected liberty interest in the first place.

Similarly, Harris' allegations that he was issued a falsified misconduct report, and that Hearing Examiner Himes denied him the opportunity to call a witness, do not constitute potential violations of Plaintiff's due process rights, as thirty days in the diversionary treatment unit does not constitute an "atypical and significant hardship" so as to trigger due process protection. See Sandin, 515 U.S. 472; Griffin, 112 F.3d 703. Thus, because Plaintiff was not deprived of a protected liberty interest, his challenge to the issuance of the misconduct charge is only actionable under § 1983 if Defendant Frye issued the misconduct in retaliation for Plaintiff having exercised a constitutional right. See Carter v. McGrady, 292 F.3d 152, 158 (3d Cir. 2002) (citing Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001)). Accordingly, summary judgment will be granted in favor of Defendants as to the procedural due process claim.

**B. Retaliation**

---

[5] Moreover, the undisputed facts show that Plaintiff was afforded procedural due process throughout the disciplinary hearing procedure, which ultimately resulted in the dismissal of the misconduct. (Doc. No. 30 ¶¶ 67, 70.) On this basis alone, Plaintiff's allegation that he was falsely accused does not support a claim for a violation of his constitutional rights. See Smith v. Mensinger, 293 F.3d 641, 653-54 (3d Cir. 2002) (citing Freeman, 808 F.2d 949).

12

Himes claims that his conversation with the law librarian is protected by the First Amendment, and that as a result of that conversation, he was subjected to retaliatory conduct by Defendant Frye, who issued a false misconduct against him. A prisoner alleging that prison officials have retaliated against him for exercising protected constitutional rights must prove the following three elements: (1) he engaged in constitutionally protected conduct; (2) he suffered adverse action at the hands of prison officials sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights; and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to take adverse action against him. Carter v. McGrady, 292 F.3d 152, 157-58 (3d Cir. 2002); Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001). Once a prisoner has made out a prima facie case of retaliation, the burden shifts to the defendants to prove by a preponderance of the evidence that they "would have made the same decision absent protected conduct for reasons reasonably related to penological interest." Rauser, 241 F.3d at 334. The Supreme Court has emphasized that courts should remain mindful that "decisions of prison administrators are entitled to great deference." Carter, 292 F.3d at 158. As such, "[p]rison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979).

Harris argues that Defendant Frye retaliated against him for exercising his First Amendment right to "free speech." Harris' retaliation claim fails to meet the first prong of a retaliation claim, however, because he does not establish any basis showing that this verbal encounter with Ms. Snyder regarding whether his work was of legal nature constitutes protected First Amendment speech. "To construe it as such would elevate every verbal exchange between a prison employee and a prisoner to the level of protected speech under the First Amendment."

Oriakhi v. Wood, Civ. No. 3-05-0053, 2006 WL 859543 (M.D. Pa. March 31, 2006) (Vanaskie, C.J.) "In order to receive First Amendment protection, an inmate's speech must relate to a matter of public concern." Id., citing McElroy v. Lopac, 403 F.3d 855, 858 (7th Cir. 2005) (inmate's inquiry about pay for lost job was not a matter of public concern).

Even if, however, the Court were to consider, arguendo, that Plaintiff met his burden with respect to demonstrating that he was engaged in a constitutionally protected activity, he does not satisfy the requisite second prong of a retaliation claim, i.e., some "adverse action" sufficient to deter a person of ordinary firmness from exercising his constitutional rights. Plaintiff's own statements reveal that he was not deterred by any alleged adverse action taken by Defendant Frye because he states that once he returned to his cell block, he began filling out a grievance form. Additionally, Plaintiff further provides that he contacted the inmate abuse hotline to report the threats of Defendant Frye to the office of special investigations and intelligence and also mailed a complaint to that office. Based on the foregoing, it is clear that Plaintiff was not deterred from exercising his First Amendment rights by the alleged adverse action of Defendant Frye. Accordingly, summary judgment will be granted in favor of Defendants as to Plaintiff's retaliation claim.

C. **Equal protection**

Plaintiff's final claim is that Defendant Frye denied him equal protection of the laws by falsifying a misconduct report. Defendants contend that Plaintiff has failed to demonstrate that Defendant Frye treated Plaintiff any differently than other prisoners. The Equal Protection Clause of the Fourteenth Amendment requires all persons "similarly situated" to be treated alike by state actors. See City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). Equal protection serves "to secure every person within the State's jurisdiction against intentional

and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." Vill. of Willowbrook v. Olech, 528 U.S. 564, 564 (2000) (citations omitted). Traditionally, "[i]n order to establish a prima facie case of discrimination under the Equal Protection Clause, [plaintiffs] need[ ] to prove that they were members of a protected class [such as race or gender] and that they received different treatment than that received by similarly-situated individuals." Oliveira v. Twp. of Irvington, No. 00-3642, 41 F. App'x 555, 559 (3d Cir. 2002) (citing Keenan v. City of Phila., 983 F.2d 459, 465 (3d Cir. 1992)).

Because the purpose of equal protection is to "protect persons, not groups," however, where a plaintiff alleges that he alone "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment," he may raise a "class of one" equal protection claim. Engquist v. Or. Dep't of Agric., 553 U.S. 591, 598 (2008) (citations omitted); Vill. of Willowbrook, 528 U.S. at 564. In order to raise such a claim, a plaintiff must allege that he has been irrationally singled out for disparate treatment. Id. "When those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference, to assure that all persons subject to legislation or regulation are indeed being 'treated alike, under like circumstances and conditions.'" Engquist, 553 U.S. at 601 (quoting Hayes v. Missouri, 120 U.S. 68, 71-72 (1887)). "[A]t the very least, to state a claim under [a class of one theory], a plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." Mosca v. Cole, 217 F. App'x 158, 164 (3d Cir. 2007). When alleging the existence of similarly situated individuals, plaintiffs "cannot use allegations … that amount to nothing more than 'conclusory,

boilerplate language' to show that he may be entitled to relief," and "bald assertion[s] that other[s] … were treated in a dissimilar manner" will not survive. Young v. New Sewickley Twp., 160 F. App'x 263, 266 (3d Cir. 2005) (citing Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005)). Instead, plaintiffs must identify similarly situated individuals and allege "occasions or circumstances" of differential treatment. Young 160 F. App'x at 226.

In the instant case, Plaintiff does not state that he is a member of a protected class. Indeed, prisoners are not a protected class of individuals. See Abdul-Akbar v. McKelvie, 239 F.3d 307, 317 (3d Cir. 2001) (stating that prisoners are not a suspect class). Moreover, in the complaint, Plaintiff makes one general allegation that his Equal Protection rights were violated. (Doc. No. 1 ¶ 45.) Plaintiff identifies no other inmates who were similarly situated to him that were treated differently by Defendant Frye. The lone allegation in the complaint is simply a "bald assertion[]" that does not allege "occasions and circumstances" of different treatment. Young, 160 F. App'x at 266. Accordingly, summary judgment will be granted in favor of Defendants as to Plaintiff's equal protection claim.

**IV.   Conclusion**

Based on the foregoing, Defendants' motion for summary judgment will be granted.[6] An appropriate Order follows.

---

[6] Defendants also argue that they would be entitled to qualified immunity because their actions were reasonable under the circumstances. (Doc. No. 29.) The Court declines to address this issue based upon its finding that Defendants are entitled to summary judgment as to Plaintiff's substantive claims.

16